UNITED STATES DISTRICT
COURT FOR THE
EASTERN DISTRICT of NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ JUN 02 2020 ★

BROOKLYN OFFICE

ANTHONY URSO
(Petitioner)

V.

UNITED STATES OF AMERICA
(Respondent)

CASE No.: 03-CR-1382 (NGG)



RECEIVED
JUN 02 2020
PRO SE OFFICE

## Petitioner's Response to the Gov't's opposition to Petitioner's Request For Relief Pursuant to his 3582(c) motion

NOW COMES Anthony Urso's, PRO SE, motion AND Response to the Gov't's Letter FORMED opposition letter DATED MAY 18th, 2020. PER FRAP RULE "5" ANSWER AND REPLY, Petitioner files this Response; AND AS FOR LEGAL REASONS thereof, MR. URSO states the Following:

## INTRODUCTION

In the Gov't's opposition they CLEARLY AVOID to address the CHANGE in the LAWS PERTAINING to Petitioner's CLAIM (SEE PAGES 3 AND 4 of Petitioner's motion) PURSUANT to (WALKER) AND (MAUPIN); where other AUSA OFFICES RECENTLY CONCEDED on what an individual CAN plea to CONCERNING what a COVERED OFFENSE in violations of 18 U.S.C. Sections 1962(d) AND 1963 alleging RICO violations (PREDICATES) OR RICO CONSPIRACIES; that NOW QUALIFIES AS "COVERED OFFENSES.

Accordingly, Petitioner's (supposed) violations as a matter of law must be removed as restated in the Gov't's lettered brief. Therefore; as per FRAP; the Gov't's purposely ignoring of Petitioner's claims are thus unopposed such as:

1) The Gov't claims that Petitioner does not identify any amended Guidelines that would affect his sentence...

Petitioner's Response:

Petitioner's motion clearly states that such changes in the law means that his plea and ultimate sentence would not have started at 240-months. Such changes of new laws, undoubtedly proves that Petitioner's sentence was therefore in error. Thus, the Gov't's claims pursuant to 3582(c)(2) seeking a denial is baseless, as by the Gov't's own admission where they state; "the defendant's Guidelines range was primarily determined by U.S.S.G. § 2A1.1 (murder) enhancement". The law states (newly) that such an enhancement/charge is deemed illegal and had Petitioner been sentenced today, (or plead); he would not have been able to be enhanced or plea to the claims of U.S.S.G. § 2A1.1 (murder).

2) The Gov't claims the First Step Act does not apply...

Petitioner's Response:

Petitioner understands that, he was not sentenced based on (or convicted of) any crack offenses; however, the Gov't leaves out that Petitioner's Rico predicates contained supposed drug offenses (and alike). Thus, as in multiple decisions across the country, District Courts have decided that the First Step Act of 2018 does not limit the claims for relief to "only" crack offenses, and individual's qualify for and are universally eligible for a reduction in his sentence if charged or enhanced pursuant to drug charges that occurred before August 2010.

3) THE Gov't now claims that the DAVIS Claim cannot be ARGUED Due to the waiver of Collateral Attacks in the Defendant's Plea Agreement....

## Petitioner's Response:

AGAIN, the Gov't decides to leap Frog over Recent SUPREME Court Decision in (CLASS); where the Court Found that an individual cannot waive his/her Constitutional Claims For Relief when challenging a violation of his Rights. Petitioner clearly states that his 5th Amendment Rights were indeed violated, when allowed to Plea to an unconstitutionally VAGUE Laws. Therefore, Petitioner cannot be time BARRED; and the CASE in (Collier) stated by the Gov't is wholly unaplicable HERE and must be Rejected as irrelevent and meritless.

Next; THE Relevancy of the FIREARM matter is such, now based on (DAVIS) Petitioner's RICO Predicate enhancements (I.E. MURDER) cannot be utilized. Period! RICO is now determined to not be a Crime of violence; and the LANGUAGE CHANGE (not the 924(c) charge itself) Applies HERE because, the Removal of the Crime of violence Compactly Changes the NARRATIVE still being oFFered up BY the Gov't, even At the onset of their MAY 18, 2020 Response Letter.

[In Sum] OF GREAT LEGAL CONSEQUENCE (here as a legal Fact); MR. URSO CANNOT BE CONSIDERED a violent Criminal to which he illegally Plead to and such a STANDING NARRATION MUST be CORRECTED From his PSR and CHARGES/Enhancements still being claimed by the Gov't toDAY!

4) THE Gov't falsely Claims that "the Defendant's Sentencing Challenges fails as well."

## Petitioner's RESPONSE:

WHAT's MORE, (CLASS) Addresses the waiver matter even under the 2255 statue. Period!

THE Gov't once Again Fails to List the Exception clause under 28 U.S.C. 2255 (F)(i), when it comes to the statue of Limitation issue. THE Rule is clear where it states the following:

<u>2255 (h)(1)(2):</u>

1) To prevent a complete miscarriage of Justice that would result from allowing a unconstitutional sentence to stand (U.S. v. Cabey) 429 F.3d 93 (2005) (Also see), (U.S. Maybeck) 23 F.3d 888 (1994), (U.S. v. Mikalajunas) 186 F.3d 490, 495 (1999)

2) A new claim raised could not have been raised in a prior motion; nor presented previously because the issue raised was not available at the time of sentencing; ((2255)(h)(2))

3) A change in the law that directly effect the guideline range of his sentence or incorrectly created resulting in an improper classification (U.S. v. Whitley), 737 F.App x 147, 148-49 (4th Cir. 2018); (Also see) (U.S. v. McCollum),885 F.3d 300, 307-09 (2018); or

4) Newly discovered evidence that if proven and viewed in the light of the evidence as a whole would be sufficent to establish by clear and convincing evidence; that no reasonable fact finder would have found the movant guilty of the offense.

Petitioner cites all four (4) above reasons in his Motion, that will also address violations of his Fifth Amendment Rights to Fair Due Process; in addition to Sixth Amendment Right violations concerning Ineffective Assistance of Counsel claims never adjudicated by the District Court. Thus, the Gov't's Claims concerning even Petitioner were to Argue Pursuant to 2255 (h)(1)(2), Also Goes unsupported As A Matter of the Rules of the Court And the LAW.

5) THE Gov't Faslely claims that Petitioner Cannot Request For Compassionate Release, due to still being Classified as a violent criminal (of all things)

Petitioner's Response:

Pursuant to the CARES ACT, Petitioner Recently filed For immediate Release For early medical/elderly Home Confinement, that does not Prohibit anyone From refiling For Relief. Once again, in the Gov't's letter, they continue to state claims that are now Pointless. Why?? Because, the new changes in the law now Reclassifies Petitioner as "NON-VIOLENT", and thus he (as a matter of law) is no longer or can no longer be labeled as a Present Danger to the safety of any other Person or to the community.

Wherefore; this organized crime story must Removed Per the law, and Petitioner's age of 83 and the correct sentence of 15-years; instead of the 20-year sentence he recieved (now being determined to be incorrect at best); and now being consider non violent strongly warrents consideration For Compassionate Release.

Next; Petitioner cites all the Potentially Deadly illnesses Listed by the CDC, and has exhausted all Remedies Already stated. The Court has full Power to address this Request, that even the Gov't's Restated claims that by law must Be Reconstructed.

Petitioner does not seek release to Home Confinement to control the spread of the corona virus at allenwood. This claim is simply false! Petitioner stated before; with all efforts supposedly being taken by the BOP staff, People are still dying at a record number, as the death toll of inmates are close to 50 and about 500 staff members have added to the outbreak. of great note; the staff at allenwood-low are not testing anyone so there is no way to know how bad the outbreak truly is.

The Gov't's claim that the BOP has the exclusive right to decide early home confinement for medical claims or risk of life. Infact; (Beyond it being complete non-sense). Recently in (U.S. V. Kelly) (Southern Dist- 2020- May) "Oakdale Prison", the court released inmate Kelly without any (No) underlying health issues. (See https://www.Gordon Defense.com/Southern-District-of-Mississippi-makes-important-Covid-19-3582-Ruling-united-states-vs-Kelly/. (See Attachment #2 and #3).

The Gov't asserts that Petitioner's health issues are true yet, the illnesses Petitioner has is not listed by the CDC, is dangerously careless and unsupported by the numerous claims decided by District Judges across the country. (More in the motion). Next, they carelessly assume that because Petitioner has been subcribed medicine "Lisinopril", he is cared for. However, what the Gov't clearly did not inquire about is that due to the lack of Care and the mis-prescriptions Petitioner cannot handle the generic medicines because it may cause faint spells and elevated vitals that when mis-diagnosed can cause a heart attack at worse. Petitioner is left to figure out when to take any subscribed medicine such as Lisinopril, for fear it will cause deadly results. Petitioner did not specify medicines because the BOP cannot provide the correct medicine to assist Petitioner's condition.

Although the Gov't continues to want to recategorize petitioner's status based on supposed actions that Petitioner plead to; However, as the court recognized at sentencing, Petitioner did not plea to a violent offense. Period! Accordingly, the BOP has Petitioner as a low risk category and at recent team meeting with "Team" staff, has begun the approval process to transfer Petitioner to a religious program at another institution... Again important to note, an individual with criminal violence in his background cannot qualify for such a great program. These re-stated narratives cannot stand and in-line with the court's finding, Petitioner plead to a non-violent offense.... not supposed relevant or actual conducts not proven by a jury of his peers.. (See U.S. V. Maupin).

[In Sum]; More then 85,000 deaths have occured at the time of Petitioner's response, the record will clearly show that pulling information off the BOP website, not calling allenwood low directly for updated events c assuming Petitioner's health/medicine intake is not supported by the incredible facts now put before this court.

*(FURTHER RESPONSE)*

I.   The Court should not entrust BOP with Petitioner care during the pandemic.

The government suggests that the Court should not grant compassionate release to Petitioner from Allenwood-Low because 1) BOP is taking significant steps to contain COVID-19, 2) Petitioner has not established that there are infected people at his facility, Allenwood-Low, and 3) the Court should leave it to the BOP to transfer inmates to home confinement pursuant to the CARES Act, rather than entertain motions for compassionate release. But the government is wrong to suggest that the Court should leave matters in the hands of the BOP.

   *A.  The rates of infection within BOP show that it is behind the curve.*

First, BOP's containment measures are obviously behind the curve. As of April *15* when Petitioner filed his request with his warden, BOP had reported *44* inmate deaths due to COVID-19, and reported that 377 inmates and staff were positive for the virus.[2] As of today, BOP is reporting 44 inmate deaths, and a total of 2,890 inmates and staff who are confirmed to be positive for the virus, as well as another 869 who have recovered from the virus – part of an exponentially greater surge than the general U.S. population has experienced.[3]

---

[1]                      (acknowledging that Petitioner sent a request for compassionate release to his warden by email on April *15,* and that the warden denied the request *(Immediately).* Given that the timing of the filing of this reply makes the government's arguments regarding exhaustion moot, the defense does not address them further.

[2] The Federal Public Defender's Office has kept screenshots of BOP's daily website updates that report new confirmed positive cases, deaths, and recoveries.

[3] https://www.bop.gov/coronavirus/. *See also* Dkt. No. 235 at 3-4.

[4] *SEE Gov't's Brief*

[5] Rep. Fred Keller (R-PA), "The Bureau of Prisons must do more to flatten the curve," *The Hill* (Apr. 13, 2020), available at https://thehill.com/blogs/congress-

**B. BOP is not uniformly implementing the containment policies relied on by the government, and implementation at Allenwood-Low is inadequate.**

Moreover, the government lauds a list of containment policies that the BOP has supposedly implemented.[4] However, BOP has been slow to act on some measures, and its execution of others has been inconsistent. For example, the BOP continued to transfer inmates from prison to prison well into April, despite its public assurances that it would cease such transfers except as absolutely necessary, according to the U.S. House Representative that represents the district in which the Allenwood complex falls.[5] Indeed, Rep. Fred Keller noted that Allenwood FCC had "continued to receive inmates from across the prison system."[6] Alarmingly, at least one inmate arrived at Allenwood sick; his "symptoms were so bad that he was immediately transported to a local hospital and tested for COVID-19."[7] Although the test came back negative, Representative Keller found this to be "a clear indication that the Bureau of Prisons is not taking necessary steps to avoid moving sick inmates," despite the "screening" the BOP cites to those concerned.[8] BOP stated that it would restrict movement further after this, but at least some, including Representative Keller, are not satisfied that BOP is doing enough to prevent spread from prison to prison by way of inmate transfers.[9]

In addition to failing to alter policies sufficiently, BOP has confirmed that it does not apply all of the policies in its directives to all of its facilities. This includes the directive providing that "inmates in every institution will be secured in their

---

blog/politics/492452-the-bureau-of-prisons-must-do-more-to-flatten-the-curve (last visited 5/6/20) [hereinafter U.S. Rep. Keller article] ("Unfortunately, the Bureau of Prisons has been reluctant to take decisive and preventative measures. In fact, over the past several weeks, while the rest of the country has been altering our daily routines and pausing our livelihoods to mitigate the spread of COVID-19, the Bureau of Prisons has continued to move inmates across the country.").

assigned cells/quarters to decrease the spread of the virus," which BOP announced on March 31 as part of Phase 5 of its "Action Plan," which the government cites in its opposition.[10] BOP informed members of Congress that this directive, colloquially referred to as a "lockdown," did not apply in at least one facility.[11] These events are further evidence that BOP's published list of policies cannot be relied on as firm evidence of what is actually happening in any individual facility, that BOP is not doing enough in every prison to stem the spread, and that it is making decisions that "seriously call[] into question [the agency's] judgement," in the words of Senator Feinstein and Representative McCarthy.[12]

Moreover, BOP's response to COVID-19 varies from prison to prison, by necessity. Petitioner experience provides an important example of this. In earlier correspondence with Petitioner the undersigned admittedly too-loosely employed the colloquial phrase "lockdown" to refer to the directive described above, providing that "inmates in every institution will be secured in their assigned cells/quarters to decrease the spread of the virus." Regrettably, the undersigned carried this imprecision into the supplemental brief.[13] Doing so masked important details about the varied application of the directive to secure inmates in their assigned cells/quarters.[14]

---

[6] *Id.*

[7] *Id.; see also*                    (citing BOP "screening" practices to the Court).

[8] U.S. Rep. Keller article, *supra* note 5.

[9] *Id.* (linking to BOP website setting out Phase 5 of its COVID-19 Action Plan); COVID-19 Action Plan: Phase 5 (March 31, 2020), *available at* https://www.bop.gov /resources/news/20200331_covid19_action_plan_5.jsp (last visited 5/7/20) (stating that BOP would be "coordinating with the United States Marshals Service (USMS) to significantly decrease incoming movement during this time"). The current details of the Inmate Movement plan may be found at https://www.bop.gov/ coronavirus/covid19_status.jsp. *See also* note 11, *infra*, describing more concerning inmate transfers between facilities.

Petitioner has now clarified that, at his low-security facility at Allenwood, this directive appears to have amounted to little more than mostly-confining inmates to sleeping areas *that are not even entirely closed off from other areas and inmates.* AN INMATE described his unit as a "dorm," a collection of 2- or 3-man "rooms" that measure about 8 feet by 11 feet, and that have no doors. Moreover, the brick walls on either side of the two beds in his shared "room" do not reach the ceiling; Petitioner estimates that they reach only 7 feet. This arrangement houses about 100 or so men on Petitioner's side of the building; on the other side of the unit are another set of these "rooms," for another hundred or so men. Other areas of the unit contain communal showers and toilets. According to Petitioner one set of showers on his side of the building are out of service and have not been repaired due to restricted visits to the prison, so roughly 100 men must share 7 showers. Petitioner's description is corroborated by those of other inmates who have recently filed motions for compassionate release from Allenwood-Low.[15] Further, the BOP does not deny that

[10] COVID-19 Action Plan: Phase 5, *supra* note 9; COVID-19 Action Plan: Phase 6 (Apr. 14, 2020), https://www.bop.gov/resources/news/pdfs/20200414_press_release_action_plan_6.pdf (last visited 5/7/20); *see also* Dkt. No. 236 at 5 (citing this directive to the Court).

[11] April 10, 2020 Ltr. From Sen. Diane Feinstein, and Rep. Kevin McCarthy to Michael Carvajal, Director, BOP [hereinafter April 10 Ltr. to Carvajal] at 1, 3 *available at* https://kevinmccarthy.house.gov/media-center/press-releases/mccarthy-feinstein-demand-that-the-taft-correctional-institution-remain (last visited 4/29/20) (linking letter stating that, "[s]hockingly, BOP officials indicated that this directive does not apply to all of its facilities, like TCI [Taft]").

Having failed to implement the directive discussed above, BOP then transferred inmates to other prisons, in groups of 40 or more, by bus. *See id.* at 3 (describing these actions as "unnecessarily risk exacerbating the potential spread of this virus to inmates and staff throughout the federal prison system among others.").

[12] *Id.*

[13] See Attachment # 4? (stating that Mr. Reese is "locked down").

[14] *See* note 10, *supra.*

[15] *See* Ex. 4 (email from Mr. Reese confirming the above, filing of inmate in *United States v. Espinal*, No. 16-cr-349 (ARR), Dkt. No. 44 (filed Apr. 27, 2020), describing Allenwood-Low housing as an "open-air dormitory-like setting, with

some inmates are housed in dormitory-style units in which they share sinks, showers and toilets, explaining that social distancing is difficult to achieve in certain correctional settings.[16]

Also according to Petitioner some inmates are still traveling from the unit to their UNICOR jobs at other parts of the prison. Further, at meal times, the entire unit walks together to another building to line up there for food that they then carry back to their unit; in the process, they cross paths with inmates from other buildings. If inmates want ice, they get it themselves from a manually-activated icemaker.

These conditions allow ample opportunity for the virus to spread. No doubt BOP is limited in what it can do with incarcerated people in confined, and varied, spaces, as the agency has noted. But even granting that, and assuming the men and women of the BOP are doing their best, all of the above demonstrates that the Court should not accept that BOP's efforts have been or can be adequate to control the

---

approximately 150 other prisoners – all in exceptionally close proximity to one another . . . [and] often far less than six feet from each other," and stating that he was better able to practice social distancing *before* April 1, when the BOP implemented what he calls the "stay in place" directive), and filing of inmate in *United States v. Mell,* 3:18-cr-757 (BRM), Dkt. No. 60 (filed Apr. 13, 2020) at 1, describing nationwide "lockdown" implemented by BOP as requiring him to "remain indoors with 100 or more inmates, in an open-air dormitory setting," requiring him to be "far less than 6 feet from at least 12 other inmates, and very often more[.]").

[16] *See, e.g.,* BOP, "Correcting Myths and Misinformation about BOP and COVID-19," *available at* https://www.bop.gov/coronavirus/docs/correcting_myths_and_misinformation_bop_covid19.pdf, and https://www.bop.gov/corona virus/) (last visited 5/7/20) ("Myth: Inmates say correctional officers are ordering them to stay six feet apart, but most of them are living in dormitory-style settings with 100 or more men. A handful of sinks, showers and toilets are shared by all. Facts: Social distancing is difficult in certain correctional settings but to counter this limitation, BOP has issued cloth face masks to all inmates and common areas are sanitized multiple times a day. Their cells can be cleaned at least 1x a day.").

spread of the virus and protect inmates, particularly at Allenwood-Low, and particularly if they are more exposed to infection than others, as Petitioner due to his

### C. The Court cannot conclude that the virus has not reached Allenwood-Low.

Second, the government states repeatedly that there are no *confirmed positive* cases at Allenwood-Low, citing BOP's website. That is true, but it is not nearly as significant as the government suggests, because "confirmed positives" more than likely excludes asymptomatic people who are infected, especially because BOP is not engaging in widespread testing.[17] Moreover, BOP has made decisions throughout this pandemic to report information in ways that obscures reality, such as the decision to exclude "confirmed positives" data from privately-run facilities.[18]

Another way BOP obscured the nature of the spread of the virus in its system, apparently, was to omit *recovered* inmates and staff from its daily facility-by-facility list of where there are infected staff or inmates (and instead list recovered individuals only in one system-wide aggregate number). For example, the undersigned noted in the supplement in support of Petitioner's motion that newspapers had reported that staff members at Allenwood USP and Allenwood Medium FCI had tested positive, yet BOP's website did not include either facility in its list of facilities with infected staff or inmates.[19] A person looking at BOP's website and unfamiliar with those news

---

[17] See Gov't's Brief

[18] *See id.*

[19] See Gov't's Brief

stories might easily have concluded that the virus had not reached any Allenwood facility, though it had. Just today, BOP has begun to list exactly where its "recovered" cases are located, and the list now includes Allenwood USP and Allenwood Medium (each showing one recovered staff member), so the website finally accurately shows that the virus has indeed touched those facilities.[20]

The government does not deny the evidence that BOP "confirmed positive" figures are misleading and/or not very informative. The government simply ignores all of this, and fails to refute the implication, which is that the Court should not put all of its faith in the BOP.

> ### D. The existence of the CARES Act home confinement program does not limit the Court's power to grant release, or counsel against doing so.

Third, the government is wrong to offer the fact that Congress has broadened BOP's authority to transfer inmates to home confinement pursuant to the CARES Act, as grounds to deny compassionate release.[21] Courts in this district have rejected that argument, explicitly and implicitly.[22] This Court should as well, because nowhere in the CARES Act did Congress state that it would supplant the courts'

---

[20] See Ex. 2 to compare screenshots of BOP's daily-updated website, https://www.bop.gov/coronavirus/, one taken on May 6, and one taken today, May 7 (providing more detail). Today is also the first day that BOP states on the table itself that it is not listing data from private facilities. See id.

[21] See, e.g., Gov't's Brief

[22] See, e.g., United States v. Poulios, No. 2:09-cr-00109 (RAJ-TEM), 2020 WL 1922775, at *2 (E.D. Va. Apr. 21, 2020) ("As an initial matter, the administrative allowances expanding the availability of home confinement provided to the BOP by the CARES Act do not limit or supersede the discretion afforded to the Court pursuant to the amended version of § 3582(c)(1)(A)."); see also United States v. Chatelain, No. 1:19-cr-133 (LMB), Dkt. No. 73 (E.D. Va., filed May 1, 2020) (implicitly rejecting this argument from government by granting compassionate release).

power to grant compassionate release to provide relief during the pandemic, and Congress would have said so if it had meant to accomplish this.

Further, the government suggests that it would be preferable to leave the problem of COVID risks to the BOP home confinement program, even if the Court is not required to do so, so that it can be administered in an orderly and systematic way. But again, the government is ignoring reality. As has been widely reported, BOP's messaging to staff and inmates about eligibility for transfer has been shifting, and confusing.[23] And the agency's response to the pandemic can hardly be considered orderly and systematic when some inmates have received summary email responses in less than a day (like Petitioner did), and other inmates get written non-responses addressed to all inmates, informing them that the warden would not be responding to individual requests because they were too voluminous and he had not gotten guidance on how to administer the program.[24] Finally, it is apparent from his warden's response that Petitioner will not obtain relief through this avenue.[25]

The government also suggests that motions such as Petitioner's "layer on a huge volume of emergency litigation" and are a burden on the BOP.[26] A related

---

[23] *See, e.g.,* Satija, N., Zapotosky, M., "Amid coronavirus pandemic, federal inmates get mixed signals about home-confinement releases," *The Washington Post* (Apr. 24, 2020), *available at* https://www.washingtonpost.com/investigations/amid-coronavirus-pandemic-federal-inmates-get-mixed-signals-about-home-confinement-releases/2020/04/24/0bbc5458-84de-11ea-a3eb-e9fc93160703_story.html (last visited 4/29/20).

[24] *See, e.g.,* Exhibit 5 (Allenwood-Low warden response to INMATE and Taft warden response to all Taft inmates).

[25] *See* Ex. 5

[26] SEE GOV'T'S BRIEF.

argument is that it would be unfair to grant release to Petitioner simply because he reached the Court before others.[27] These arguments are nonsensical: the BOP has not responded to these motions for compassionate release, so they impose no litigation burden on the BOP. And, that one person in danger might be released ahead of other deserving inmates is not an argument to leave him in danger. It is an argument for more motions, not fewer.

In short, there is nothing before the Court to suggest that the best course is to defer to the BOP.

II.     **The Court has the information and judgment needed to assess this case and grant release.**

The government also suggests that the BOP is in a better position than the Court to assess Petitioner request for compassionate release. But, again, the Bureau's history of poorly administering compassionate release, and the steps Congress has recently taken to ensure that defendants have ready access to courts, shows that this is wrong.[28]

The government cites a litany of factors that BOP is supposedly in a better position than the Court to assess.[29] First, many of these factors have nothing to do with Petitioner's individual circumstances (*e.g.* "appropriate triage," and whether his release would "make a difference to disease transmission" to others, comparison of whether it would be better to release this inmate or another, weighing of supervision

---

[27] *Id.*

[28] *See. Attach # 3*

[29] *See Gov't's Brief*

resources). These go well beyond the relevant question: whether, in *his* case, the circumstances are extraordinary and compelling. The government's discussion seems to assume that compassionate release is a finite resource, and that it is available only if it is consistent with BOP's preferred approach to the crisis. But Section 3582(c)(1)(A)(i) includes no such limits: the statute empowers the Court to exercise compassion on behalf of any individual who comes before the Court with "extraordinary and compelling reasons," such as the medical conditions Petitioner presents.

Second, the list ignores the fact that Section 3582 specifically empowers courts to assess factors such as the adequacy of the release plan, because even the BOP cannot achieve compassionate release without the Court's approval. The government's opposition essentially assumes that the Court can assess these factors only after the BOP has, and only after BOP has determined that they weigh in favor of release and so files a motion, without explaining why that would be, or why that *should* be, in a national emergency. The truth is that the Court has as much information as the BOP would have about the release plan, and is just as capable as the BOP at assessing it. Indeed, the Court would have to do so eventually, no matter what.

III.   There are extraordinary and compelling reasons for release here, and Pe-
       titioner release plan is adequate.

In arguing that this case does not present "extraordinary and compelling reasons," the government does not dispute that Petitioner's reliance on MEDICINE's places him at higher risk than most of contracting COVID-19 should it be present in his facility. Nor does the government dispute that an individual with no underlying illnesses can also be released on early home confinement. Additionally, Petitioner's illness puts him at even higher risk of severe illnesses or death should he contract the deadly virus.

*A. Petitioner's request is not based solely on any one factor, but rather a combination of factors.*

Next, the government argues that BOP's guidance does not support release due to a chronic condition "alone," or lack of disciplinary record "alone," citing several cases that pre-date the COVID-19 pandemic.[34] But Petitioner has already demonstrated that the Court is not bound by BOP's guidance (which is unduly narrow).[35] Moreover, Petitioner is not seeking release solely due to his chronic conditions, or solely due to his positive rehabilitation, making the cases cited by the government inapplicable.[36] He is seeking release because of the combined impact of his medical conditions, conditions at his prison, and the COVID-19 pandemic: this barely-understood, highly contagious, and often invisible disease is spreading like wildfire through the BOP, and conditions at Allenwood-Low necessarily will make it difficult to avoid if it has or eventually does reach that facility. Petitioner reliance on *MEDICINES* makes it particularly hard for him to avoid it. His chronic conditions make it particularly likely that, if he gets it, he could become severely ill, or die. This Court should join the many that have found similar combinations of circumstances present extraordinary and compelling reasons to modify sentences, where the factors in 18 U.S.C. § 3553 also support release, as they do here.[37]

---

from 2015 listing medication taken for diabetes and asthma, and noting regular diabetic checks, weight of 305 pounds, and systolic measure consistently at 140 or higher). According to the National Heart, Lung, and Blood Institute website, "[y]our doctor may diagnose you with high blood pressure when you have consistent systolic readings of 140 mm Hg or higher or diastolic readings of 90 mm Hg or higher."). *See* https://www.nhlbi.nih.gov/health-topics/high-blood-pressure (last visited 5/6/20).

34   *SEE Gov't's Brief*

35   "

36   "

*β. The government's focus on the lack of reported cases at Allenwood-Low misses important points favoring release.*

The government also argues that the circumstances do not provide compelling reasons for release because Allenwood-Low has been "locked down," BOP has not *reported* any cases at Allenwood-Low, and the county in which Allenwood sits has reported only 38 confirmed cases.[38] Again, as clarified above, Petitioner remains very exposed to viral infection due to conditions in his unit. Further, the fact of no *reported* cases at Allenwood-Low is worth little weight, for the reasons already given. Likewise, the number of reported cases in Union County is not an informative figure without evidence that there has been widespread testing in the county, which the government does not provide. Nor does citing it take into account the risk created by the transfer of prisoners to Allenwood from other prisons in other parts of the country, as well as the risk posed by staff who may contract the disease outside of the facility and expose inmates in the course of their work.

Moreover, even if there were truly no cases at Allenwood-Low today, that could change tomorrow: Indeed, in the past two weeks, COVID-19 has continued to be

---

[37] See *NEW CASE LAWS*, see also *United States v. Tillman*, 1:07-cr-00197-PLM-1, 2020 WL 1950835 (W.D. Mich. Apr. 23, 2020) (granting compassionate release to a defendant with asthma and diabetes); *United States v. McGraw*, 2:02-cr-00018-LJM-CMM, 2019 WL 2059488, at *1–2 (S.D. Ind. May 9, 2019) (granting compassionate release to 72 year-old inmate with limited mobility, diabetes, kidney disease, Hepatitis C, and other issues).

[38] *SEE Gov't's Brief AND Attach #6*

discovered for the first time in BOP facilities that previously reported no cases, despite the directives that BOP has issued. For example, before May 2, FCI Gilmer in West Virginia was reporting no cases; it reported the first that day, after BOP transferred inmates from the D.C. system to the facility.[39] And, despite nationwide "lockdowns," there has been exponential growth of confirmed positive cases at many facilities in the past two weeks.

- Butner Medium I: increased from 29 to 212 inmate cases.
- Forrest City Low: increased from 37 to 169.
- Fort Worth FMC: increased from 56 to 470.
- FCI Lompoc: increased from 8 to 541.
- FCI Terminal Island: increased from 58 to 618.[40]

Finally, the ideal time to release a high-risk individual due to the threat posed by COVID-19 is *before* the infection gets to his or her facility, so that he can avoid infection, not after it reaches the prison, by which time he may already be gravely ill,

---

[39] These comparisons come from daily tracking of BOP's website, https://www.bop.gov/coronavirus/, conducted by the Office of the Federal Public Defender. *See* Bri Clark, "UPDATE: Sen. Manchin issues statement regarding COVID-19 case at FCI Gilmer," *www.WVNSTV.com https://www.wvnstv.com/news/fci-gilmer-inmate-tests-positive-for-covid-19-just-days-after-being-transferred/* (noting that prison union president at FCC Hazleton confirmed a prisoner from FCI Gilmer has tested positive for the coronavirus days after inmates were transferred to the prison earlier this week.") (last visited 5/6/20). Likewise, Keeton Corrections, Inc., a residential reentry center, had no reported cases on May 4, but did on May 5.

[40] These figures come from daily tracking of BOP's website, https://www.bop.gov/coronavirus/, conducted by the Office of the Federal Public Defender. They do not reflect deaths.

or worse.[41] Other courts have done so, and this court should as well. *See, e.g., Casey v. United States*, No. 4:18-cr-4, Dkt. No. 35 (E.D. Va. May 5, 2020) (granting compassionate release to 76-year-old defendant at FCI Petersburg Low suffering from severe cardiac issues, despite absence of reported cases there); *United States v. Echevarria*, No. 3:06-cr-269 (MPS), 2020 WL 2113604 (D. Conn. May 4, 2020) (granting compassionate release to defendant at FCI Allenwood suffering from bronchial asthma, despite absence of reported cases there).

### D. Petitioner *will be safer at home than he is at Allenwood-Low.*

In a similar vein, the government argues that Petitioner's release plan is insufficient because it entails his going to live in a house in NEW YORK noting that NEW YORK has experienced 100,000's confirmed positive cases and 3,642 fatalities, per the CDC. As devastating as those numbers are, again, they mean nothing in comparison to the numbers at Allenwood-Low absent evidence that there has been any testing conducted there.

The government also notes that Petitioner would have to go to the doctor to obtain medication, were the Court to release him. First, counsel expects that if the Court released Petitioner the BOP would release him with 30 days' worth of his

---

[41] On April 1st, a district court in Northern Florida commuted a life sentence for a defendant named Andre Williams to time-served with 12-months home confinement, finding age and medical conditions created significant risk of "life threatening illness should he be exposed to COVID-19 while incarcerated." *U.S. v. Williams*, No. 04-cr-95, at *7 (N.D. Fla. Apr. 1, 2020) (ECF No. 91). Before the order granting release was filed, Mr. Williams caught coronavirus in FMC Butner. He died April 12th. *See* BOP, Inmate Locator website, *available at* https://bit.ly/2XDfgZe); https://www.bop.gov/ resources/press_releases.jsp (last visited 4/29/20).

prescribed medication.[43] Second, were he unable to obtain new prescriptions with a phone call or telemedicine visit, then doing so would probably entail one trip to a doctor's office, which could be expected to practice extremely careful infection-avoidance strategies (on that trip and any necessary trip that follows). His family could obtain the prescriptions and other necessities for him.[44]

In short, the government's objections to Petitioner's plan essentially amount to objections that the plan cannot guarantee that he will never be exposed to infected people. But perfection in a release plan is not the standard an inmate must meet to compassionate release. Here, if released, Petitioner can almost entirely avoid people outside of his immediate family, and practice ideal hygiene; at Allenwood, he cannot, placing him at much higher risk for infection, and for severe illness or death.

## CONCLUSION

For these reasons and those already given, Petitioner respectfully requests that the Court grant his request for compassionate release, and modify the terms of his supervised release to include a period of home confinement. *Also, according to new case laws, recategorize Mr. Urso has non-violent, while reducing his sentence to 15-years; and any further relief this court deems necessary in the interest of fairness and equal justice.*

*Respectfully Submitted*

*Anthony Urso*

Dated: *May-26*, 2020

*Anthony Urso, Pro Se*
*Fed No. 04109-748*
*LSCI Allenwood-Low*
*P.O. Box 1000*
*White Deer, PA 17887*

---

[43] A BOP representative at another facility informed the undersigned that this is standard practice.

## AFFIDAVIT

I Hereby Certify that the foregoing facts are true and correct to the best of my knowledge and belief under penalty of perjury as per 28 USC Section 1746.

*Anthony Urso*

ANTHONY URSO, Pro Se

## CERTIFICATE OF SERVICE

I Hereby Certify that a copy of the foregoing Petition/Motion was mailed on this 26 day of May , 20 20, by First Class Mail, postage prepaid to:

Office of the US Attorney
271 CADMAN PLAZA E
U.S. DOJ
BROOKLYN, N.Y. 11201

*Anthony Urso*

ANTHONY URSO, pro se

ATTACHMENT(S)

Exhibit 5

 **Tall Correctional Institution**

# MEMORANDUM

Date:     April 6, 2020

To:       Camp Inmate Population

From:     D. Patrick, Executive Assistant/Grievance Coordinator

cc:

RE:       Response to Influx of Inmate Requests to Staff

This is in response to the multiple Requests to Staff (Cop-outs) which have been forwarded to my office for response. Due to the number of Requests to Staff received, individual responses will not be provided, nor will any future requests regarding this same matter be addressed.

Staff has not been provided guidance by the Bureau of Prisons (BOP) regarding the Attorney General's Memorandums involving any revised procedures for an inmate's placement on Home Confinement. Therefore current procedures will remain in place.

Furthermore, due to the current decision by the Bureau of Prisons to close the facility and the subsequent transfer of all inmates, each of you will have to make this request at your new facility.

Attach # 1

** INBOUND NOTIFICATION : FAX RECEIVED SUCCESSFULLY **
TIME RECEIVED                 REMOTE CSID            DURATION        PAGES       STATUS
April 12, 2020 at 7:44:41 PM EDT         BOP Inmate                  57             1         Received

04/12/2020 18:43                                      BOP Inmate      917-727-9194                                              P1

---

### ***SUPPLEMENT TO EMERGENCY MOTION FOR RELEASE***

APRIL 13, 2020

THE HONORABLE BRIAN R. MARTINOTTI
UNITED STATES DISTRICT JUDGE
UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
402 EAST STATE STREET
TRENTON, NEW JERSEY 08608

      Re: United States v. Steven Bradley Mell, Docket No. 18-CR-757 (BRM)

Dear Judge Martinotti:

      Defendant respectfully seeks leave to file this Emergency Supplemental Motion for Release via facsimile, due to the current institutional lock-down which prevents inmates from accessing legal writing materials and copy-machines.

      Pending before the Court is Defendant's motion for bail pending habeas relief. Defendant has presented extraordinary circumstances in support of his motion -- i.e., the threat of the novel coronavirus ("COVID-19"). The Government has filed an opposition to the motion, but that opposition has not yet been received by Defendant as it was filed under seal, and Defendant is not represented by counsel (and unable to obtain private counsel).

      Since filing the pending emergency motion for bail, at least one staff member at the Allenwood Complex is believed to have tested positive for COVID-19. Further, upon information and belief, at least one inmate was reported to have exhibited symptoms after being transferred into the institution, and was removed to a local hospital. Both accounts were reported in local and national news.

      On April 3, 2020, U.S. Attorney General William Barr directed that the Bureau of Prisons immediate release inmates to home confinement if they have COVID-19 risk factors, as determined by the CDC. Despite that directive, staff at L.S.C.I. Allenwood have failed to do so. The category of "at-risk" inmates includes those who have congestive heart failure, other coronary disease, and other immune system deficiencies, such as cancer. Defendant's medical conditions include chrohns disease, PSC (primary sclerosing cholangitis), liver disease, heart disease, high blood pressure, and asthma/bronchitis.

      The state of Defendant's health places him at an increased risk of contracting and perishing from the virus. The likelihood of contracting the virus is heightened by the fact that Defendant (given the lock-down procedure that commenced on April 1, 2020) is required to remain indoors with more than 100 other inmates, in an open-air dormitory setting. At any given time, Defendant is forced to be within far less than six feet of at least 12 other inmates, and very often more. The virus will be inescapable once (not if) it presents itself in Defendant's housing unit, and one can reasonably expect that death will be swift and certain for many, including this Defendant, given the inability of the medical staff at the institution to deal with the crisis. It also bears noting that screening at this institution has occurred on only three occasions over the past two weeks, creating the possibility for late detection and rampant spread.

      There are extraordinary and exceptional circumstances which warrant not only Defendant's release on bail, but the modification of his term of imprisonment under 18 U.S.C. 3582(c)(1)(A). Unless this Court endeavor to afford him the appropriate relief, his sentence of 7 years imprisonment will likely be a death sentence.

      Accordingly, in view of the exigent circumstances, the Court should order Defendant released on bail (forthwith) with a condition of strict home confinement.

Respectfully submitted,

/s/ Steven Bradley Mell

STEVEN BRADLEY MELL
REGISTER NO. 71587-050
L.S.C.I. ALLENWOOD
P.O. BOX 1000
WHITE DEER, PA 17887

cc: Patricia Astorga, AUSA

*Attach #2*

1 of 1

<u>E M E R G E N C Y M O T I O N *** THREAT OF COVID-19 *** E M E R G E N C Y M O T I O N</u>

APRIL 27, 2020

[BY FAX: (718) 613-2386/2437]
THE HONORABLE ALLYNE R. ROSS
UNITED STATES DISTRICT JUDGE
UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
225 CADMAN PLAZA EAST
BROOKLYN, NEW YORK 11201

Re: United States v. Juan Espinal, Docket Nos. 16-CR-349 (ARR)/09-CR-683 (ARR)/08-CR-242 (ARR)

Dear Judge Ross:

Defendant respectfully submits this emergency letter-motion, pursuant to 18 U.S.C. 3582(c)(1)(A), for an order modifying his term of imprisonment in the wake of the coronavirus pandemic, and the threat it poses to his safety. For the many reasons set out below, this motion should be promptly granted.*

I.    INTRODUCTION

As amended by the First Step Act of 2018, 18 U.S.C. 3582(c)(1)(A)(i) authorizes a court to modify and reduce a term of imprisonment upon a motion of the defendant (after the defendant has exhausted his administrative remedies), upon a finding that "extraordinary and compelling reasons" warrants such a reduction. 18 U.S.C. 3582(c)(1)(A)(i). Defendant here submits that he has exhausted his administrative remedies, insofar as he has requested relief from the Warden of his facility, and his request was denied. Further, since the Bureau of Prisons has determined that Defendant is not eligible for relief, further attempts at exhaustion would be nothing more than an exercise in futility. Further, this case presents both "extraordinary and compelling reasons" (i.e., Defendant's heightened vulnerability to contracting and perishing from the virus) to modify the sentence.

1.    EXTRAORDINARY AND COMPELLING REASONS TO MODIFY SENTENCE.

Defendant is serving his sentence at the Low Security Correctional Institution in Allenwood, Pennsylvania. Since April 1, 2020, Defendant has been confined (24 hours) to his assigned housing unit, an open-air, dormitory-like setting, with approximately 150 other prisoners -- all in exceptionally close proximity to one another. Prisoners are often far less than six feet from each other. Thus, social distancing under these circumstances is an impossibility. Prior to April 1, 2020, the date a national prison "stay in place" directive was implemented, Defendant was afforded a daily opportunity to practice social distancing. The "stay in place" directive placed inmates in considerably closer proximity to one another, for considerably longer periods, increasing the potential for the virus to spread to more prisoners faster. Although Bureau of Prisons officials certainly intended for the "stay in place" initiative to minimize the likelihood of spreading the virus, and thus their goal to protect prisoners, the opposite is certain to prove to be the case.

Notably, prisoners at Defendant's institution are not being tested for the virus, and minimal screening (temperature checks) are performed once a week. The lack of more robust screening or testing heightens the risk already associated with the pandemic. Placing prisoners in closer proximity to one another, for longer periods of time -- indeed, 24 hours a day -- without testing or frequent screening, is a recipe for disaster. A disaster that is certain to occur. This is especially true given the ability of the virus to lay dormant and apparently mutate. At least one lawmaker [Fred Keller, (R-Pa.) recently criticized the Bureau of Prisons for failing to adhere to public health guidelines, thereby placing prisoners at a greater risk.
Given Defendant's vulnerability, there is a substantial likelihood that, unless modified, the term of imprisonment imposed will effectively become a death sentence.

These extraordinary and compelling reasons warrant swift and certain action by the Court. Clearly, the circumstances both authorize and warrant an order modifying the term of imprisonment, and the Court should endeavor to do so, promptly. See, United States v. Colvin, Docket No. 3:19-CR-179 (D. Conn. Apr. 2, 2020)(granting emergency modification motion to protect the prisoner from contracting the virus); United

*Attach #3*

States v. Resnick, Docket No. 12-CR-152 (S.D.N.Y. Apr. 2, 2020)(same); United States v. Sawicz, Docket No. 08-CR-287 (E.D.N.Y. Apr. 10, 2020)(same); United States v. Brannan, Docket No. 4:15-CR-80 (S.D. Tex. Apr. 3, 2020)(same)

## II.   EXHAUSTION OF ADMINISTRATIVE REMEDIES.

Defendant has requested of the Warden that he be released to home confinement under both the CARES Act, and directives issued by the U.S. Attorney General to the Bureau of Prisons on March 26, 2020 and April 3, 2020, in light of his heightened risk of contracting the virus, and perishing from it. The Warden declined his request citing to Bureau of Prisons policy rendering Defendant ineligible for the relief he seeks. Nothing more is required since any further attempts to exhaust his administrative remedies will be met with the exact same results. Further attempts would therefore be futile, and the Court has jurisdiction to entertain and grant this motion for emergency modification of the sentence.

"Even where exhaustion is seemingly mandated by statute or decisional law, [as is the case with Section 3582(c)(1)(A)(i)), the requirement is not absolute." Washington v. Barr, 925 F.3d 109, 118 (2d.Cir. 2019) Exhaustion would be unnecessary where an attempt to resolve the matter with the agency would be nothing more than an exercise in futility. An individual "may bypass the administrative process where exhaustion would be futile or inadequate." Honig v. Doe, 484 U.S. 305, 327 (1988); Smith v. Robinson, 468 U.S. 992, 1014 n.17 (1984). Exhaustion would be futile where there is a "certainty of an adverse decision" from the agency. Fraley v. U.S. Bureau of Prisons, 1 F.3d 924, 925 (9th Cir. 1993); McQueen v. Colo. Springs Sch. Dist. No. 11, 488 F.3d 868, 875 (10th Cir. 2007). "[I]f an agency has articulated a very clear position on the issue which it has demonstrated it would be unwilling to reconsider," exhaustion is not required. Randolph-Sheppard Vendors of America v. Weinberger, 795 F.2d 90, 105 (D.C. Cir. 1986). Further, the fact that an administrative agency lacks, or believes itself to lack authority to act upon a dispute can make an adverse decision certain. See, Weinberger v. Wiesenfeld, 420 U.S. 636, 641 n. 8 (1975); McNeese v. Board of Education, 373 U.S. 668, 674-76 (1963).

Accordingly, the Court should consider this motion on the merits.

## III.   CONSIDERATION OF THE FACTORS SET FORTH IN 18 U.S.C. 3553(a).

The Court is required to consider the factors set forth in 18 U.S.C. 3553(a) in deciding whether to modify a term of imprisonment. In that regard, Defendant submits that nothing in Section 3553(a) counsel against granting this motion.

## IV.   CONCLUSION.

For the reasons stated, Defendant respectfully requests that this Court modify the term of imprisonment imposed by reducing it to "time-served," and directing his immediate release. Thereafter, Defendant will self-quarantine at his residence for at least 14-days, and adhere to any other restrictions or conditions that the Court in all its wisdom deems appropriate

WHEREFORE, Defendant prays that this motion will be granted.

Respectfully submitted,

/s/ Juan Espinal

JUAN ESPINAL
REGISTER NO. 75928-053
L.S.C.I. ALLENWOOD
P.O. BOX 1000
WHITE DEER, PA 17887

---

\* By virtue of a national institutional lockdown, inmates are not afforded access to legal writing materials, such as paper, printers or photocopies. Consequently, Defendant seeks leave to file this Emergency Motion via facsimile.

cc: U.S. Attorneys Office

**Sent Date:**       Thursday, May 7, 2020 6:20 PM

**To:**

**Subject:**        RE: Please confirm whether this is an accurate sum

This is accurate for the most part and I agree with the description in your email (herein) of the accounts that is going on here at Allenwood-Low. although it does not speak to all that I have share with you, I find that it is most relevant to the on goings here at this institution. Thanks Reese
                on 5/7/2020 4:36 PM wrote:

>

Mr. Reese,
Please reply to let me know if the below is an accurate summary of what you have observed and shared with me in the last two days.  Thank you.

Moreover, BOP's response to COVID-19 varies from prison to prison, by necessity. Mr. Reese's experience provides an important example of this.  In correspondence with Mr. Reese, the undersigned admittedly too-loosely employed the colloquial phrase "lockdown," and, regrettably, carried this imprecision into the supplemental brief. Doing so masked important details about the varied impact of the directive to secure inmates in cells or quarters, discussed above.  Mr. Reese has now clarified that, at his low-security facility at Allenwood, BOP's directive to  "secure[ inmates] in their assigned cells/quarters to decrease the spread of the virus" appears to mean nothing more than confining men to sleeping areas that are not even entirely walled-off from other areas and inmates.  Mr. Reese described his unit as a "dorm," a collection of 2- or 3-man "rooms" that are about 8 feet by 11 feet, and have no doors.  Moreover, the brick walls on either side of the two beds he and his bunk-mate share do not reach the ceiling; Mr. Reese estimates that they reach only 7 feet.  This set up houses about 100 or so men on Mr. Reese's side of the building; on the other side of the unit are another set of these "rooms," for another hundred or so men. Other areas of the unit contain communal showers and toilets.  According to Mr. Reese, one set of showers on his side of the building are out of service and have not been repaired due to restricted visits to the prison, so roughly 100 men must share 7 showers.

Also according to Mr. Reese, some inmates are still traveling from the unit to their UNICOR jobs at other parts of the prison.  Further, at meal times, the entire unit walks together to another building and lines up there for food that they then walk back to their unit; in the process, they cross paths with inmates from other buildings.  If they want ice, they get it themselves from a manually-activated icemaker.

*Attach #4*

From:                ALF/InmateToWarden
Sent:                Thursday, April 9, 2020 11:41 AM
To:                  ~^!LAWRENCE WAYNE ~^!REESE
Subject:             7249bf21-8d8e-4dfb-ae4e-5fc25a744138

The Bureau of Prisons has identified nine criteria for which you must meet to be considered for home confinement due to Covid-19, if you have underlying medical conditions identified by the CDC. This criteria has been developed based off of the AG Memo and the Cares Act, you must meet all of the below listed criteria;

1) Primary Offense is not violent;

2) Primary Offense is not sex offense;

3) Primary Offense is not terrorism;

4) No detainer;

5) Mental Health Care Level is less than IV

6) PATTERN risk score is MIN

7) BRAVO score is LOW or MIN

8) Served at least 50% of their sentence

9) No Incident Reports in the past 12 months

Your current offense is classified as violence (unless it is overturned by the court), your current PATTERN risk scores is low, and you have only served 32 percent of your current sentence, therefore you do not meet the criteria at this time.


>>> ~^!"REESE, ~^!LAWRENCE WAYNE" <71980054@inmatemessage.com> 4/8/2020 4:52 P.M >>>
To: Warden
Inmate Work Assignment: ccs1

***ATTENTION***

Please cut and paste the message indicator below into the subject line; only this indicator can be in the subject line.
7249bf21-8d8e-4dfb-ae4e-5fc25a744138
Your response must come from the departmental mail box.  Responses from personal mailboxes WILL NOT be delivered to the inmate.

***Inmate Message Below***


Warden,

Attach #5

I already met with the unit manager today and she told me to reach out to you directly on this matter because she said she could not address these issues. Thus, I email you to inform you that due to the change I the law for my crime I am now consider a non-violent inmate un the (U.S. V. Davis; No 18431) recently decided in 2018. My arson charges of 18 USC 844(n) conspiracy to commit arson, 844(i) arson; 844(h) all are in fact now disqualified as a "crime of violence"; leaving me with a simple "fraud charge" that carries a 5 year maximum term of imprisonment. Also, once this has been reclassified by you and/or the Court's (which I have a motion in for reduction of my sentence as a matter of law), I am now 1.5 years pass the time in which I should be doing and thus I should not be here after serving close to 5 years and counting. Additionally; due to my potentially terminally medical history, I qualify for early home (medical) confinement due to the Covid-19 virus outbreak as my illness is high blood pressure asthma and chronic airway obstructions and alike, just to name a few. Again, I write to inform you and ask that you or your staff contact the court directly to inquire of this new development of the law in which I now "MUST" be considered for immediate release on both matters now presented to you in this email. I look forward to hearing back from you asap. Thanks!

2

# COVID-19 Cases

05/07/2020 - The BOP has **140,369** federal inmates in BOP-managed institutions and **11,161** in community-based facilities. The BOP staff complement is approximately **36,000**. There are **2646 federal inmates** and **244 BOP staff** who have confirmed positive test results for COVID-19 nationwide. Currently, **591 inmates** and **278 staff** have recovered. There have been **44 federal inmate deaths** and **0 BOP staff member deaths** attributed to COVID-19 disease.

Due to the rapidly evolving nature of this public health crisis, the BOP will update the open COVID-19 confirmed positive test numbers, recoveries, and the number of COVID-19 related deaths daily at 3:00 p.m. The positive test numbers are based on the most recently available confirmed lab results involving open cases from across the agency as reported by the BOP's Office of Occupational Health and Safety at 11:00 a.m. each day. BOP field sites may report additional updates throughout the day. Data is subject to change based on additional reporting.

The BOP has begun additional testing of asymptomatic inmates to assist in slowing transmissions within a correctional setting. As such, our data reflects an increase in the number of COVID-19 positive tests reflected in the table below. The BOP is able to better utilize this information for the management of an outbreak at the relevant, affected facility.

The inmate totals listed do not include inmates participating in the Federal Location Monitoring program or being held in <u>privately managed prisons</u>. Additionally, the reference to the FCI Butner Low below refers to an isolation unit that is physically separated from the rest of the LSCI.

| Facility ▲ | Inmates Positive | Staff Positive | Inmate Deaths | Staff Deaths | Inmates Recovered | Staff Recovered | City | State |
|---|---|---|---|---|---|---|---|---|
| Aliceville FCI | 6 | 4 | 0 | 0 | 3 | 3 | Aliceville | AL |
| Allenwood Medium FCI | 0 | 0 | 0 | 0 | 0 | 1 | White Deer | PA |
| Allenwood USP | 0 | 0 | 0 | 0 | 0 | 1 | Allenwood | PA |
| Atlanta USP | 4 | 6 | 0 | 0 | 12 | 3 | Atlanta | GA |
| Beaumont Low FCI | 0 | 1 | 0 | 0 | 0 | 0 | Beaumont | TX |
| Beaumont Medium FCI | 0 | 3 | 0 | 0 | 0 | 0 | Beaumont | TX |

*Attach # 6*

# COVID-19 Cases

The BOP has **140,708** federal inmates in BOP-managed institutions and **10,817** in community-based facilities. The BOP staff complement is approximately **36,000**. As of 05/06/2020, there are **2100 federal inmates** and **365 BOP staff** who have confirmed positive test results for COVID-19 nationwide. Currently, **559** inmates and **149** staff have recovered. There have been **42** federal inmate deaths and **0** BOP staff member deaths attributed to COVID-19 disease.

Due to the rapidly evolving nature of this public health crisis, the BOP will update the open COVID-19 confirmed positive test numbers and the number of COVID-19 related deaths daily at 3:00 p.m. The positive test numbers are based on the most recently available confirmed lab results involving open cases from across the agency as reported by the BOP's Office of Occupational Health and Safety. BOP field sites may report additional updates throughout the day. Data is subject to change based on additional reporting.

The BOP has begun additional testing of asymptomatic inmates to assist in slowing transmissions within a correctional setting. As such, our data reflects an increase in the number of COVID-19 positive tests reflected in the table below. The BOP is able to better utilize this information for the management of an outbreak at the relevant, affected facility.

The inmate totals listed do not include inmates participating in the Federal Location Monitoring program. Additionally, the reference to the FCI Butner Low below refers to an isolation unit that is physically separated from the rest of the LSCI.

| Inmates Positive ▾ | Staff Positive | Inmate Deaths | Staff Deaths | Facility | City | State |
|---|---|---|---|---|---|---|
| 621 | 15 | 6 | 0 | Terminal Island FCI | San Pedro | CA |
| 467 | 1 | 4 | 0 | Fort Worth FMC | Fort Worth | TX |
| 211 | 13 | 6 | 0 | Butner Medium I FCI | Butner | NC |
| 113 | 1 | 0 | 0 | Forrest City Low FCI | Forrest City | AR |
| 105 | 23 | 0 | 0 | Chicago MCC | Chicago | IL |
| 105 | 49 | 8 | 0 | Elkton FCI | Lisbon | OH |
| 57 | 3 | 0 | 0 | Lexington FMC | Lexington | KY |
| 52 | 10 | 0 | 0 | Lompoc FCI | Lompoc | CA |
| 50 | 4 | 0 | 0 | Yazoo City Low FCI | Yazoo City | MS |
| 48 | 17 | 7 | 0 | Oakdale I FCI | Oakdale | LA |
| 40 | 3 | 0 | 0 | Fort Dix FCI | Joint Base Mdl | NJ |
| 34 | 15 | 1 | 0 | Lompoc USP | Lompoc | CA |
| 27 | 3 | 0 | 0 | Butner Low FCI | Butner | NC |

| | | | | | | |
|---|---|---|---|---|---|---|
| 24 | 15 | 1 | 0 | Danbury FCI | Danbury | CT |
| 23 | 0 | 1 | 0 | Oklahoma City FTC | Oklahoma City | OK |
| 20 | 0 | 0 | 0 | Volunteers of America, Inc. (Minnesota) (RRC) | Minneapolis | MN |
| 19 | 0 | 0 | 0 | GEO Reentry, Inc. (RRC) | Leavenworth | KS |
| 15 | 40 | 3 | 0 | Milan FCI | Milan | MI |
| 7 | 0 | 0 | 0 | Community Resources for Justice, Inc. (RRC) | Boston | MA |
| 6 | 4 | 0 | 0 | Aliceville FCI | Aliceville | AL |
| 6 | 0 | 0 | 0 | Central Territorial of the Salvation Army; DBA Salvation Army Correctional Ser (RRC) | Chicago | IL |
| 6 | 8 | 1 | 0 | Yazoo City USP | Yazoo City | MS |
| 5 | 4 | 0 | 0 | Butner FMC | Butner | NC |
| 4 | 6 | 0 | 0 | Atlanta USP | Atlanta | GA |
| 4 | 0 | 0 | 0 | Volunteers of America Texas, Inc. (RRC) | Hutchins | TX |
| 3 | 2 | 0 | 0 | Bennettsville FCI | Bennettsville | SC |
| 3 | 0 | 0 | 0 | Cherry Street Services, Inc. (RRC) | Grand Rapids | MI |
| 3 | 0 | 0 | 0 | Kintock Group, The (RRC) | Philadelphia | PA |
| 3 | 0 | 0 | 0 | Kintock Group, The (RRC) | Newark | NJ |
| 2 | 0 | 0 | 0 | GEO Reentry of Alaska, Inc. (RRC) | Oakland | CA |
| 2 | 8 | 0 | 0 | Oakdale II FCI | Oakdale | LA |
| 1 | 0 | 0 | 0 | Behavioral Systems Southwest, Inc. (RRC) | Los Angeles | CA |
| 1 | 0 | 0 | 0 | CORE Services Group, Inc. (RRC) | Brooklyn | NY |
| 1 | 0 | 1 | 0 | Carswell FMC | Fort Worth | TX |
| 1 | 0 | 0 | 0 | Cherry Street Services, Inc. (RRC) | Detroit | MI |
| 1 | 1 | 0 | 0 | Coleman Low FCI | Sumterville | FL |
| 1 | 0 | 0 | 0 | GEO Care, LLC (RRC) | Sacramento | CA |
| 1 | 0 | 0 | 0 | Gilmer FCI | Glenville | WV |
| 1 | 0 | 0 | 0 | Keeton Corrections, Inc. (Birmingham) (RRC) | Birmingham | AL |
| 1 | 0 | 0 | 0 | Pioneer Human Services; DBA: | Seattle | WA |

| | | | | | | |
|---|---|---|---|---|---|---|
| 1 | 0 | 0 | 0 | Pioneer Industries (RRC) | Seattle | WA |
| 1 | 0 | 0 | 0 | Southeast Missouri Behavioral Health, Inc.; DBA: SEMO CTC (RRC) | Farmington | MO |
| 1 | 0 | 0 | 0 | Volunteers of America (RRC) | Metairie | LA |
| 1 | 0 | 0 | 0 | Volunteers of America of Greater Ohio (RRC) | Toledo | OH |
| 1 | 0 | 0 | 0 | Volunteers of America of Western New York, Inc. (RRC) | Rochester | NY |
| 1 | 0 | 0 | 0 | Watkinson House (RRC) | Hartford | CT |
| 1 | 4 | 0 | 0 | Yazoo City Medium FCI | Yazoo City | MS |
| 0 | 1 | 0 | 0 | Beaumont Low FCI | Beaumont | TX |
| 0 | 3 | 0 | 0 | Beaumont Medium FCI | Beaumont | TX |
| 0 | 0 | 1 | 0 | Behavioral Systems Southwest, Inc. (RRC) | Phoenix | AZ |
| 0 | 31 | 0 | 0 | Brooklyn MDC | Brooklyn | NY |
| 0 | 1 | 0 | 0 | Canaan USP | Waymart | PA |
| 0 | 1 | 0 | 0 | Coleman I USP | Sumterville | FL |
| 0 | 2 | 0 | 0 | Cumberland FCI | Cumberland | MD |
| 0 | 0 | 1 | 0 | Devens FMC | Ayer | MA |
| 0 | 1 | 0 | 0 | Englewood FCI | Littleton | CO |
| 0 | 2 | 0 | 0 | Fairton FCI | Fairton | NJ |
| 0 | 3 | 0 | 0 | Forrest City Medium FCI | Forrest City | AR |
| 0 | 0 | 1 | 0 | GEO Care, Inc. (RRC) | Bronx | NY |
| 0 | 1 | 0 | 0 | Grand Prairie | Grand Prairie | TX |
| 0 | 1 | 0 | 0 | La Tuna FCI | Anthony | TX |
| 0 | 1 | 0 | 0 | Lewisburg USP | Lewisburg | PA |
| 0 | 1 | 0 | 0 | Los Angeles MDC | Los Angeles | CA |
| 0 | 1 | 0 | 0 | McCreary USP | Pine Knot | KY |
| 0 | 1 | 0 | 0 | Memphis FCI | Memphis | TN |
| 0 | 14 | 0 | 0 | Miami FDC | Miami | FL |
| 0 | 29 | 0 | 0 | New York MCC | New York | NY |
| 0 | 10 | 0 | 0 | Otisville FCI | Otisville | NY |
| 0 | 3 | 0 | 0 | Philadelphia FDC | Philadelphia | PA |

| | | | | | | |
|---|---|---|---|---|---|---|
| 0 | 6 | 0 | 0 | Ray Brook FCI | Ray Brook | NY |
| 0 | 1 | 0 | 0 | Rochester FMC | Rochester | MN |
| 0 | 1 | 0 | 0 | Southeast RO | Atlanta | GA |
| 0 | 1 | 0 | 0 | Tallahassee FCI | Tallahassee | FL |

Anthony Urso #04109-748/B·B
L.S.C.I. AllenWood
P.O. Box 1000
White Deer, PA. 17887

MAY 26 2020

CERTIFIED MAIL

7019 2280 0000 7074 0986

Clerk of The
225 Cadm
Brooklyn, N